**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL BERGER, Derivatively on Behalf of Nominal Defendant CPI AEROSTRUCTURES, INC.<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>DOUGLAS MCCROSSON, VINCENT PALAZZOLO, TERRY STINSON, ERIC ROSENFELD, JANET K. COOPER, CAREY E. BOND, WALTER PAULICK, HARVEY J. BAZAAR,<br><br>　　　　　　　Defendants,<br>　　and<br><br>CPI AEROSTRUCTURES, INC.,<br><br>　　　　　　　Nominal Defendant. | Civil Action No.:<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................... 1

II.   JURISDICTION AND VENUE .................................................................... 14

III.  PARTIES ...................................................................................................... 15

A.  Plaintiff ..................................................................................................... 15

B.  Nominal Defendant .................................................................................. 15

C.  Individual defendants .............................................................................. 15

IV. DUTIES OF THE INDIVIDUAL DEFENDANTS .................................... 17

V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ..................... 19

VI.   SUBSTANTIVE ALLEGATIONS ............................................................ 20

A.  CPI's History of Premature Revenue Recognition and "Weaknesses" In Internal
    Control that Boosted Revenues ................................................................ 20

B.  CPI's Credit Issues .................................................................................. 22

C.  Concealment Regarding the WMI Debacle ............................................ 23

D.  CPI Pretends to Adopt ASC 606 ............................................................ 25

E.  The Individual Defendants Cause or Allow CPI to Issue False and Misleading
    Statements ................................................................................................ 28

F.  ███████████ ███ █████████ ███ the Individual Defendants' Scheme
    Unravels .................................................................................................... 37

G.  The 2020 Restatement .............................................................................. 45

VII.  DAMAGES TO CPI .................................................................................. 52

VIII. DEMAND IS FUTILE ............................................................................... 53

IX.   PLAINTIFF'S CLAIMS ............................................................................ 55

PRAYER FOR RELIEF ...................................................................................... 57

Plaintiff Paul Berger ("Plaintiff"), by and through his undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") on behalf of nominal defendant CPI Aerostructures, Inc. ("CPI" or the "Company") against the defendants named herein. Plaintiff alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, which included, but was not limited to, a review of U.S. Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company, a review of internal documents produced by CPI and designated confidential in connection with the resolution of Plaintiff's demand for inspection of books and records of CPI pursuant to New York common law in the matter styled *Paul Berger v. CPI Aerostructures, Inc.*, Index No. 606553/2020 (Sup. Ct. Suffolk Cnty.) (the "Inspection Demand"), a review of the files in *CPI Aerostructures, Inc. v. Air Industries Group, et al*., Index No. 653397/2018 (Sup. Ct. N.Y. Cnty.), and consultation with an expert from an international accounting, assurance and advisory firm with expertise in ASC 606 as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiff Paul Berger is a long-time CPI shareholder who brings this derivative action to protect the New York defense contractor from further value destruction by its management, Board of Directors (the "Board") and Audit Committee members. These directors and officers have, over a number of years, engaged in a large number of financial manipulations, cover-ups, omissions and misstatements, all aimed at creating a false impression that the struggling aerospace concern is prospering. This had led to class actions, an SEC investigation, and stock price devastation.

2.    The bad faith actions of the Board members are revealed by documents Plaintiff

filed suit to obtain under New York's right to inspect corporate records. They show that ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████ These documents also show that ████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████ As shown herein, the Board ████████████ ███████████████████████████████████████████████ the second financial restatement in two years, this time eliminating $96 million in phantom contract assets from the books.

3.    The actions of the Defendant officers and directors over the past decade have followed a common pattern: they all serve to *increase* CPI's purported revenues and earnings by recognizing millions or even tens of millions of dollars in revenue prematurely. This scheme is based on claiming as revenues sums under long-term government contacts that have not been earned, may never be earned, may never reflect orders CPI actually receives, and cannot be tied to any agreement that could be viewed as a binding contract or purchase order (as accounting rules require). In the past six years, CPI has reversed prematurely recognized revenues in material amounts no fewer than *four times.*

4.    CPI's "revenue enhancement" practices apparently began under long-time CEO Edward J. Fred ("Fred"). Fred became CPI's CFO in 1999, President at the beginning of 2002, and CEO in 2003. When Fred attained these positions, CPI was a failing concern. In early 2002, the stock was at $1.50 per share. During his 10-year tenure, the stock increased to prices higher than $16 a share. While Fred was an able businessman, under his leadership CPI developed a proclivity to claim revenues under government contacts where such revenues might never be earned, a

troubling pattern that continued long after his departure.

5.      The house of cards constructed by CEO Fred began to collapse in 2014. On March 6, 2014, Fred resigned, just as the revenue structure he built was on the verge of being exposed as illusory.  Fiscal results for 2013 were disappointing and results for 2014 would reflect a large revenue reversal. Fred's departure came two days after the Department of Defense submitted its 2015 budget request. In that budget, funding for one of CPI's crucial projects was threatened. This was the aircraft A-10 Wing Replacement Program ("WRP"). This was significant for CPI, since it had been recognizing phantom revenues under its WRP contract since 2008, *even though such revenues had not been earned and might never be.* These developments caused CPI under new CEO Douglas McCrosson in August 2014 to reverse an astounding *$47 million* in prematurely recognized revenues. As a result, CPI reported $39.7 million in revenues for 2014, as opposed to $83 million in revenues in 2013, and a net loss of $25.2 million, as compared with 2013 net income of $7.7 million. This 2014 reversal erased *all* of the net income CPI claimed to have realized in the previous four years. Thereafter, the Company had a hard time finding its footing. Another revenue reversal came in the first quarter of 2016. The stock price suffered, declining to under $7 a share by mid-2016. While CPI was sinking, its rivals in the S&P Aerospace & Defense Select Industry Index increased their stock prices on average between August 2014 and June 2016 by roughly 50%.

6.      While Fred departed as CEO in March 2014, the directors who served with him, and supported his tactics continued on. Directors who served with Fred include present director defendants Eric Rosenfeld and Walter Paulick, and non-defendant director Michael Faber, all of whom still serve on the CPI Board today. Under these directors more premature revenue recognition and more revenue reversals were to come.

7.      In the years following the WRP revenue reversal, CPI did not (or could not) raise funds in the market for needed capital, nor could it secure substantial bank funding. By the end of 2017, the Company had proven unable to repay a $10 million term loan, and had only $7 million in credit left on its $30 million facility with Bank United. By March 31, 2018, CPI had violated its leverage covenant with Bank United, even though the Individual Defendants filed a Form 10-Q with the SEC denying that this had occurred. (Form 10-Q, filed May 15, 2018, p. 15: "As of March 31, 2018, the Company was in compliance with all of the financial covenants contained in the BankUnited Facility, as amended."). As of that date, CPI had only $5 million in borrowing capacity.

8.      Not only was CPI languishing, but the Company had been required to adopt a new accounting standard in 2018 – ASC 606. The new standard was designed, in part, to halt premature recognition of revenue during long-term contracts by requiring revenue recognition be tied to a contract for goods or services that was "binding as a matter of law."  From subsequent revelations, it is now known that CPI never abandoned the revenue recognition tactics used under former CEO Fred, and was recognizing vast revenues under contracts that could not in any way be said to be "binding as a matter of law." ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Regardless, their non-binding nature was evident ████████████

████████████████████████████████

9.      An accounting adjustment of this nature would have chilled any effort by the Company to raise money in the capital markets, something CPI sorely needed to do before 2018 was over. Thus, no such adjustment was taken. To the contrary: in order to raise money from

unwitting investors, CPI's revenues were artificially inflated yet again.

10.    The prelude to this artificial inflation was the Company's effort to reverse its slide by making an acquisition in early 2018. The acquisition target was Welding Metallurgy, Inc. ("WMI"), a Long Island, New York aerospace fabricator whose customers overlapped with those of CPI, and which had capabilities CPI lacked. The proposed acquisition, which was subject to financing, was announced with great gusto on March 22, 2018 by CEO McCrosson, who said: "With WMI we will efficiently increase our footprint on newer, shared defense programs such as the E-2D and F-35, while opening opportunities to new customers and programs …" The prospects raised by the acquisition caused CPI's share price to increase, and soon it was back again to the $10 range.

11.    How the roughly $10 million purchase would be paid was unclear, but the Company suggested in its 2017 Form 10-K that it anticipated obtaining a new term loan. *See* Form 10-K, filed March 22, 2018, p.16 ("The Company anticipates financing the Acquisition through a new term loan to be included with an expanded and extended credit facility to be negotiated with the Company's existing lender."). The Individual Defendants knew such a new term loan was highly unlikely, given the failure to repay the old term loan, but nonetheless made this representation and never withdrew it. No new term loan ever materialized. Ultimately, the payment for WMI would be made with the proceeds of an October 2018 secondary stock offering (the "October 2018 Offering"), whose "Use of Proceeds" section said nothing at all about the proceeds being used to pay for this acquisition, leaving investors still to believe that new term loan was obtainable, and that the offering proceeds would bolster the weak balance sheet. This misrepresentation, and others made in connection with the October 2018 Offering, will be discussed further herein.

12.    Thus, by the first half of 2018: (a) CPI was struggling to gain new business and

acquire funding; (b) the Individual Defendants had sufficient knowledge to determine that CPI had recognized revenue prematurely, and that ███████████████████████████████████, as ASC 606 required; (c) CPI was failing its debt covenants, and did so for the quarters ending in March and June 2018; and (d) CPI did not know how to finance its acquisition of WMI. What the Defendants did know for sure was that CPI had a dire need to raise money via a public offering— there was no other source of funds. This October 2018 Offering was to be accomplished by means of more accounting chicanery.

13.     As 2018 progressed, CPI proved unable to close the WMI transaction, despite a projected closing in the second quarter of 2018. In assessing WMI, CPI had developed doubts as to the high value placed on its inventory by WMI's insiders and its accountant. CPI's auditor, CohnReznick, LLP ("CohnReznick" or "CR") devoted months to an attempt to audit and confirm the inventory numbers, but either proved unable to do so, or unwilling to do so. According to papers filed in *CPI Aerostructures, Inc. v. Air Industries Group, et al.*, Index No. 653397/2018 (Sup. Ct. N.Y. Cnty.) (the "WMI Litigation"), both sides accuse the other of being uncooperative in connection with that audit attempt.[1] In any event, the deal threatened to collapse, and if that happened the upcoming October 2018 Offering could collapse with it.

14.     On the brink of the October 2018 Offering, the CPI Board entered into a "pretend solution" to the issues that would allow the deal to go forward.  This solution involved CPI accepting an audit report prepared by WMI's auditor (which they suspected to be inaccurate), and then reporting the numbers they suspected to be inaccurate to CPI's shareholders as "provisional" numbers, subject to later revision.  However, when the deal closed at the end of 2018 with the

---

[1] The core dispute raised in the WMI Litigation was effectively dismissed on procedural grounds on October 1, 2020 (subject to refiling as a special proceeding) without resolution of the parties' underlying claims.

proceeds of the October 2018 Offering, CPI almost immediately turned around and stated that the WMI inventory was off by millions of dollars.

15.     With that problem "solved," another issue was the apparent lack of enthusiasm for the October 2018 Offering. It was ultimately priced at $6.25 per share, well below market price.

16.     Although it was not required to do so, to create interest in the stock sale, CPI offered a prediction in the Prospectus Supplement for the October 2018 Offering of a robust third quarter of 2018, a prediction that was almost immediately after the offering closed shown to be false due to an accounting "error."  On page S-8 of the Prospectus Supplement dated October 16, 2018, CPI stated: "We expect to announce the results for the quarter ended September 30, 2018 on or about November 8, 2018. *We preliminarily expect to report revenue of approximately $19 million, with diluted earnings per share of approximately $0.13/share." See* Form 10Q-A, filed February 27, 2019, p. 10 (emphasis added). This would have been perceived by new investors (or existing investors wishing to add to their positions) as an indication CPI was on an even keel. Earnings for the three months ended June 30, 2018 were 14 cents per share, exactly consistent with the earnings for the three months ending March 31, 2018.  *See* Form 10-Q, August 9, 2018, p.4; Form 10-Q, May 15, 2018, p.4. The 13 cents per share prediction was exactly (and remarkably) consistent with the prior two quarters.[2]

17.     While such bullish numbers were indeed soon reported (indeed, an even higher 15 cents per share number was announced on November 8, 2018), *they were false.* An accounting restatement announced just weeks later (right before the auditors came in) showed true earnings

---

[2] Reporting the same exact net earnings quarter after quarter is a red flag for fraud – results that do not differ from one quarter to the next are highly unlikely without manipulation.  *See* Dichev, et al, *The Misrepresentation of Earnings,* (Financial Analysts Journal 72:1, 2016), p. 31 (A red flag arises where: "Earnings and earnings growth are too consistent…"). Available at: https://pdfs.semanticscholar.org/3c96/8e6b35e125416dcca11c61768d734d6c50b0.pdf

per share to have been *7 cents per share*, less than half the number reported. Predicting the true number—a mere 7 cents per share—would have been to forecast a serious financial reversal, which would have damaged or precluded the October 2018 Offering. Thus, the motive for a manipulation is clear. As described herein, another and far bigger restatement was to come a year later, after █

█████████████████████████████████████

18.     The early 2019 restatement figures are very significant in relation to the original numbers reported. For the nine months ended September 30, 2018, net income was adjusted downward from $3.84 million to $3.10 million, a decline of 19% (and 60% for the third quarter of fiscal 2018 alone). This disparity was due to the false recognition of revenue in the amount of $927,000, which remarkably increased income by *$742,000. See* Form 10Q-A, filed February 27, 2019, p. 9. The cause of the "error" was preposterously attributed to an errant entry by an accounting clerk. And, as noted, conveniently this "error" was discovered right after CPI sold $16.1 million worth of stock at $6.25 per share in the October 2018 Offering.

19.     Instead of being reprimanded or dismissed for this "error," CFO Vincent Palazzolo was rewarded. As the 2019 Proxy Statement reported: "For the year ended December 31, 2018, Mr. Palazzolo received $53,697 in performance-based cash compensation. In addition, Mr. Palazzolo was awarded an aggregate of 13,002 shares of restricted stock (with a fair market value on the date of grant of $107,267) pursuant to the Company's 2016 long-term incentive plan." *See* Proxy, filed April 30, 2019, p.19.

20.     CPI claimed that its revenue recognition issues had been fixed, but they had not. They had only grown worse. Numerous departures of financial executives followed to quietly conceal defendants' machinations. First, the long-time Audit Committee Chairman retired from his position and as a director on June 19, 2019 (the date of the 2019 annual meeting). Next, CFO

Palazzolo, ███████████████████████████████████████████████████

████████████████████ on November 13, 2019, without CPI ever publicly offering a reason

why. Although SEC Form 8-K required CPI to state whether Palazzolo had resigned or been fired,

it merely stated that he "left the company," in violation of this important disclosure rule. ████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Form 8-K stated: "Mr. Palazzolo will

receive separation benefits as set forth in the Severance and Change in Control Agreement entered

into on July 7, 2016, which is attached as Exhibit 10.2 to the Company's Current Report on Form

8-K filed on July 7, 2016." These provisions would result in severance payments and benefits to

Mr. Palazzolo of approximately $300,000.

     21.     CFO Palazzolo was replaced by new CFO Azmon on November 18, 2019. Azmon

joining the Company would have given stockholders great cause for reassurance, as Azmon's

reputation and credentials are impeccable. Just prior to joining CPI, Azmon had served for *19*

*years* as Vice President, Controller and Principal Accounting Officer of L3 Technologies, Inc., a

major aerospace company with 38,000 employees and almost $10 billion in revenue. Azmon left

that position when L3 merged with another company. Azmon also held financial leadership roles

at ASARCO and Salomon Brothers, and managed the audit practice at Coopers & Lybrand.

     22.     But after being on the job *less than three months*, Azmon, ████████████████

██████████████████████████████████████, resigned his position as CPI's

CFO effective February 11, 2020. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████

23.     As an experienced aerospace industry accountant, Azmon was aware that ASC 606 had the potential to drastically reduce the number of CPI contracts that permitted early revenue recognition. But these changes had not taken place at CPI during the two years it had been purportedly applying ASC 606. ASC 606 is a revenue recognition standard that outlines a single, comprehensive model for accounting for revenue from customer contracts. It identifies and answers two of the most fundamental questions related to revenue: ***First***, when may an entity recognize revenue? ***Second***, how much revenue may an entity recognize? As the international auditing firm PricewaterhouseCoopers LLP observed in its published guidance on ASC 606, the provision is of critical import as "[r]evenue is one of the most important financial statement measures to both preparers and users of financial statements. It is used to measure and assess aspects of an entity's past financial performance, future prospects, and financial health. Revenue recognition is therefore one of the accounting topics most scrutinized by investors and regulators."[3]

24.     As to the first question – *When may an entity recognize revenue?* – ASC 606 provides than an "entity may recognize revenue when it satisfies its obligation under a contract by transferring goods or services to its customer. That is, when the entity performs, it should recognize revenue."[4]

25.     As to the second question – *How much revenue may an entity recognize?* – an "entity may recognize the amount to which it expects to be entitled under the contract." *Id.*

26.     Although CPI adopted ASC 606 in January 2018, the Company failed to revise its historical accounting practices and continued to recognize revenue upon the receipt of long-term

---

[3]   https://www.pwc.com/us/en/cfodirect/assets/pdf/accounting-guides/pwc-revenue-recognition-global-guide.pdf

[4]   https://www2.deloitte.com/us/en/pages/audit/articles/a-roadmap-to-applying-the-new-revenue-recognition-standard.html

agreements or master agreements that did not constitute accounting contracts for which revenue could be recognized under ASC 606.



27.

28.

Only then did the Individual Defendants concede they had materially overstated CPI's

revenues.

Azmon also took 

29.    On August 25, 2020, the Company filed its Form 10-K for the fiscal year ended December 31, 2019 containing the 2020 Restatement. As a result of the Individual Defendants' breaches of fiduciary duty, the Company restated its December 31, 2018 pre-tax income by more than $14.2 million – more than two times less than the originally reported $6.6 million – resulting in a loss of $7.5 million. Contract assets were written down by *$96 million.*

30.    The first three quarters ending September 30, 2019 were also restated. Contract assets were written down by $107 million. Earnings went from a positive $3.1 million to a negative $5.9 million. That there were losses rather than profits helps explain why CPI was always short of cash. A disconnect between reported earnings and Cash flows is yet another red flag for fraud—

one the Board no doubt recognized.[5]

31.    In connection with the 2020 Restatement, it was also found that key internal controls were deficient or even non-existent.

32.    More executive departures have followed. Most recently, Janet Cooper, who has only served as a director since April 2019 and was the successor to the long-time Audit Committee Chair also suddenly departed in the midst of the restatement turmoil, declined to stand for re-election and will cease being a CPI director as of October 6, 2020 – the date of CPI's annual meeting of shareholders. These troubling departures and their proximity to the restatements bolster Plaintiff's breach of fiduciary duty claims and have drawn regulatory attention.[6]

33.    Revelations about the Company's continued inability to maintain adequate internal controls over financial reporting and unusual executive departures spawned shareholder litigation, including a federal securities class action for violations of the federal securities laws. The federal securities class action is captioned *Rodriguez v. CPI Aerostructures, Inc., et al.*, Case No. 1:20-cv-00982-ENV-JO (E.D.N.Y.).

34.    Moreover, CPI recently revealed that the SEC is investigating the restatements, the October 16, 2018 equity offering and the sudden CFO departures:

> On May 22, 2020, the Company received a letter (the "SEC Letter") from the SEC Division of Enforcement (the "Division") indicating that the Division staff is conducting an investigation involving the Company. The SEC Letter states that the investigation is a non-public fact finding inquiry where the Division staff is trying to determine whether there have been any violations of federal securities laws. As part of this investigation, the Division issued a subpoena to the Company seeking documents and information relating, among other things, to previously-disclosed errors in and restatements of, the Company's financial statements, the Company's

---

[5] *See* Dichev, *supra* n.1, at 31 (earnings that do not "correlate" with cash flows a known red flag).

[6] *Cf. In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009)(upholding fraud complaint, and noting that the proximity of the departures of high ranking officers to financial restatements and investigations adds "one more piece to the scienter puzzle.").

October 16, 2018 equity offering and the recent separation of the Company's former Chief Financial Officers. The SEC Letter states that the investigation and the subpoena do not mean that the Division staff has concluded that the Company or anyone else have violated the federal securities laws and that the investigation does not mean that the Division staff has a negative opinion of any person, entity or security. We intend to fully cooperate with the Division staff. However, we cannot predict the length, scope, or results of the investigation or the impact, if any, of the investigation on our results of operations.

35.     CPI has been grievously harmed by the Individual Defendants' breaches of fiduciary duty. CPI's reputation and goodwill have been irreversibly tainted and the Company will expend millions in connection with SEC investigation and to defend and/or settle the securities fraud class action lawsuits. Further governance changes, accounting changes, board changes, audit committee changes and internal control changes need to be implemented. Plaintiff, a CPI shareholder, brings suit on behalf of CPI to remedy and redress the damage done to the Company by the Individual Defendants, and to bring about the real corporate governance changes that have been needed for a very long time.

## II.     <u>JURISDICTION AND VENUE</u>

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the Plaintiff and each defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

37.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by District courts in this District permissible under traditional notions of fair play and substantial justice.

38.     Venue is proper in this District in accordance with 28 U.S.C. § 1391 because: (i) CPI maintains its principal executive offices in the Eastern District of New York; (ii) one or more of the defendants either resides in or maintains offices in the Eastern District of New York; and (iii) a substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the Eastern District of New York.

## III.    PARTIES

### A.    PLAINTIFF

39.     Plaintiff Paul Berger is currently, and has been at all relevant times, a shareholder of CPI common stock since at least July 6, 2009. Plaintiff is a citizen of Washington, D.C.

### B.    NOMINAL DEFENDANT

40.     Nominal Defendant CPI is a New York corporation with its principal executive offices located at 91 Heartland Blvd., Edgewood, NY 11717. The Company stock trades on the New York Stock Exchange under the symbol "CVU." CPI supplies aircraft parts for fixed wing aircraft and helicopters in commercial and defense markets.  The Company is a prime contractor to the U.S. Department of Defense. CPI also provides engineering, supply chain management, and maintenance, repair and overhaul ("MRO") service. CPI is a citizen of New York.

### C.    INDIVIDUAL DEFENDANTS

41.     Defendant Douglas McCrosson ("McCrosson") has served as the Chief Executive Officer, President, and a director of the Company since March 2014. He first joined the Company in 2003 as Director of Business Development and has held numerous executive-level positions within the Company. McCrosson is also a defendant in the securities fraud class action. Upon information and belief, McCrosson is a citizen of New York.

42.     Defendant Vincent Palazzolo ("Palazzolo") served as CPI's Chief Financial Officer

from May 2004 to November 2019. Palazzolo is also a defendant in the securities fraud class action. Upon information and belief, Palazzolo is a citizen of New York.

43.    Defendant Terry Stinson ("Stinson") was appointed Non-Executive Chairman of the Board in November 2018, served as Chair of the Compensation and Human Resources Committee ("Compensation Committee") from June 2014 until June 2018 and has served as a director since 2014. Stinson has also served as a member of the Compensation Committee and the Strategic Planning Committee. Upon information and belief, Stinson is a citizen of Texas.

44.    Defendant Eric Rosenfeld ("Rosenfeld") was appointed Chairman Emeritus in November 2018. Previously, Rosenfeld served as Non-Executive Chairman of the Board since 2005 and as a director since 2003. Rosenfeld also served as a member of the Compensation Committee, Nominating and Corporate Governance Committee ("Nominating Committee") and Chair of the Strategic Planning Committee. Upon information and belief, Rosenfeld is a citizen of New York.

45.    Defendant Janet K. Cooper ("Cooper") was a director of CPI from April 2019 through October 6, 2020. Cooper served as Chair as the Audit Committee and a member of the Oversight Committee. Upon information and belief, Cooper is a citizen of Colorado.

46.    Defendant Carey Bond ("Bond") has been a director of CPI since 2016. Bond has served since Chair of the Compensation Committee since June 2019 and Chair of the Oversight Committee since March 2020. Upon information and belief, Bond is a citizen of Florida.

47.    Defendant Walter Paulick ("Paulick") has been a director of CPI since April 1992. Paulick served as Chair of the Nominating Committee from March 2004 until June 2015 and Chair of the Audit Committee from June 2006 until April 2007. Upon information and belief, Paulick is a citizen of New York.

48.     Defendant Harvey J. Bazaar ("Bazaar") served as a director of the Company from 2006 to June 2019 and as Chair of the Audit Committee from April 2007 to June 2019. Mr. Bazar was a certified public accountant having retired from PriceWaterhouseCoopers in 2000 as the Global and Americas Leader for the Capital Markets Group. Upon information and belief, Bazaar is a citizen of New York.

49.     Non-Defendants Michael Faber ("Faber") and Richard Caswell ("Caswell") also serve as directors of the Company.  Faber has been a director of CPI since 2013 and has served as Chair of the Nominating Committee since June 2014.  Caswell was appointed to the Board on November 4, 2004.

50.     Collectively, the defendants identified in paragraphs 41 - 48 are referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, directors and/or fiduciaries of CPI and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed CPI and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage CPI in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CPI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

52.     Each director and officer of the Company also owes to CPI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CPI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with CPI, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper practices of CPI.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CPI, and was at all times acting within the course and scope of such agency.

55.     To discharge their duties, the officers and directors of CPI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company. By virtue of such duties, the officers and directors of CPI were required to, among other things:

a.     refrain from acting upon material inside corporate information to benefit themselves;

b.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

c.     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.     remain informed as to how CPI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

e.     ensure that the Company was operated in a diligent, honest and prudent

manner in compliance with all applicable laws, rules and regulations.

56.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of CPI, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the relevant time period has been ratified by the remaining Individual Defendants who collectively comprised CPI's Board during the relevant period.

57.     The Individual Defendants breached their duties of loyalty and good faith by allowing, or by themselves causing, the Company to misrepresent its business, operations and prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct by causing the Company to conceal the true facts as alleged herein.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and breaches of fiduciary, to conceal adverse information concerning the Company's operations, financial condition and future business prospects, and to artificially inflate the price of CPI common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

60.     The Individual Defendants accomplished their conspiracy, common enterprise

and/or common course of conduct by failing to implement internal controls and/or causing the Company to purposefully, recklessly or negligently fail to oversee the accuracy of the Company's public statements to its shareholders and the investing community and by abdicating their duty to monitor the Company's operations to ensure compliance with applicable laws, rules and regulations. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

61.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

62.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CPI, and was at all times acting within the course and scope of such agency.

## VI.    **SUBSTANTIVE ALLEGATIONS**

### A.    CPI'S HISTORY OF PREMATURE REVENUE RECOGNITION AND "WEAKNESSES" IN INTERNAL CONTROL THAT BOOSTED REVENUES

63.    CPI's aerospace business typically generates long term contracts, known as "programs." Under former CEO Fred, CPI adopted the practice of estimating eventual program revenues, even where such program might be cut back or discontinued, and no such revenues would ever really be recognized.

64.    One of its major programs in 2014 was the A-10 Wing Replacement Program ("WRP"), which was performed under a subcontract with Boeing. As to this contract and others,

CPI recorded what it termed "costs and estimated earnings in excess of billings on uncompleted contracts." This was purportedly an approximation of how much CPI had earned under a contract based on work performed, even though such funds might never be received. Under CEO Fred, this metric grew from $3 million in 2009 to $113 million at the end of 2013. Even though these sums might never be received, they were nonetheless billed as revenues. Of the $113 million, $82 million was attributable to government contracts, and the vast majority of this was related to the WRP.

65.     CPI's stock ended the year 2013 at $15.04 per share. By the end of 2014, it was $10.21 per share. This 30% decline was due to a cutback by the Department of Defense in the WRP project, causing CPI to reverse $47 million in prematurely recognized revenue. As a result, CPI reported $39.7 million in revenues for 2014, as opposed to $83 million in revenues in 2013, and a net loss of $25.2 million, as compared with 2013 net income of $7.7 million. This 2014 reversal erased *all* of the net income CPI claimed to have realized in the previous four years.

66.     That so much revenue needed to be reversed was a red flag for aggressive estimation by CPI's management, and especially by CFO Vincent Palazzolo, who had served in that position since 2004. Despite this undue aggressiveness (or more likely because of it), Palazzolo was kept on even after this write-down, and continually rewarded by the Board.

67.     At this point, there began a series of accounting "errors" by management and the Board, which always had the effect of increasing revenue, never decreasing it.

68.     In the fourth quarter of 2015, CPI recognized revenue improperly and without the necessary documentation. These actions were caught in time by its auditor, who concluded there was a weakness in internal controls. As stated in CPI's Form 10-K for the year ending December 31, 2015:

> A material weakness is a control deficiency or combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the

annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness was identified as of December 31, 2015: due to an ongoing negotiation with one customer, the Company submitted a request for equitable adjustment ("REA") on a contract, as allowed under the contract. During the fourth quarter of 2015, the Company initially concluded that it had sufficient documentation to recognize revenue based upon the REA. After further evaluation, *management concluded that it did not have sufficient documentation to record such revenue and therefore its review controls over this REA were not adequate*. Management has already implemented practices and procedures to address the foregoing material weakness, including more timely reviews of infrequently occurring transactions, such as an REA. Additionally, the Company is undertaking a process to increase the size and technical expertise of its accounting staff to evaluate such transactions in the future on a more timely basis.

69.    This was thus the second of what would be four revenue reversals in a 5 year period, each time due to some claimed innocuous error, and each time resulting in the premature recognition of revenue.

### B.    CPI's Credit Issues

70.    Because CPI's cash flows and revenues do not match, and likely due to a lack of credibility, the Company has long-standing issues obtaining credit.

71.    While difficulties in securing credit are common, CPI's management and Board fell into the habit of hiding credit issues, or even making false claims about loans.

72.    Thus, the quarterly report for the quarter ending March 31, 2018 reported that CPI was in compliance with all loan covenants. *See* Form 10-Q, filed May 15, 2018, p. 15: "As of March 31, 2018, the Company was in compliance with all of the financial covenants contained in the BankUnited Facility, as amended." But later, when CPI requested a waiver, this was revealed to be untrue. "Section 7.1(b) of the Agreement, Maximum Leverage Ratio, which should have been not greater than 3.0 to 1.0 for the trailing four fiscal quarters ended March 31, 2018 and June 30, 2018, *but was actually a 3.21 to 1.0 as of the end of March 31, 2018*, and 3.32 to 1.0 at the end of June 30, 2018." Credit Agreement dated August 15, 2018, p. 9 (filed as an exhibit to Form 8-K, August 16, 2018) (Emphasis added).

73.     In addition, as noted, when CPI entered into a contract to acquire WMI the Board represented that the deal could be financed with a new term loan. How such a thing was possible they did not say, as CPI had proved unable to repay its old term loan. Eventually, the full sum was paid out of the proceeds of the October 2018 Offering.

74.     As to the October 2018 Offering, the "Use of Proceeds" section of the Prospectus created the false impression that the funds would sure up general working capital. The Prospectus said: "We estimate that the net proceeds to us from this offering will be $13.98 million (or $16.10 million assuming the over-allotment option is exercised in full), after deducting underwriting discounts and commissions and an aggregate of $200,000 in estimated offering expenses payable by us for this offering. We intend to use the net proceeds from the sale of common stock by us in this offering for general corporate purposes which may include working capital, capital expenditures, debt repayment, or acquisitions." *See* Prospectus Supplement, Aug. 16, 2018, p. S-13. While "acquisitions" was listed as the fourth possible (and least likely) use of the proceeds, the truth was that half the proceeds would go to acquire WMI, even though CPI had been unable to determine the true value of WMI's inventory.

### C.     CONCEALMENT REGARDING THE WMI DEBACLE

75.     As noted, CPI reported its agreement to acquire Long Island defense manufacturer WMI in glowing terms in March 2018. That acquisition has led to years of litigation between CPI and WMI in the WMI Litigation, styled *CPI Aerostructures, Inc. v. Air Industries Group, et al.*, Index No. 653397/2018 (N.Y. Cnty. Sup. Ct.).

76.     According to an Affidavit filed in the WMI Litigation by Michael Recca, CFO of WMI's corporate parent, CPI and its auditor CohnRezick conducted due diligence on WMI from October 2017 to the signing of the acquisition agreement in late March 2018. *See* WMI Litigation, Doc No. 121, Oct. 15, 2019, ¶ 15. This due diligence did not reach a conclusion as to whether

WMI's financial statements were accurate. *Id.* Rather, CohnReznick from March 2018 through July 2018 focused on auditing inventory, but at the end of this period were unable or unwilling to certify the value of WMI's inventory. *See id.*

77.    According to WMI, CohnReznick advised the CPI Board in or about June 2018 that it was "unable to complete the audit." *See* WMI Litigation, Answer and Counterclaim, Doc No.14, July 30, 2018, ¶ 17. The WMI Litigation filings suggest CPI CFO Palazzolo did not wish to look too closely at the inventory question. For example, Palazzolo set up a daily inventory conference call schedule, and then failed to arrange for or attend the anticipated calls. *Id.*, ¶¶ 16, 20.

78.    WMI's notice that it wished to cancel the agreement imperiled CPI's announced expansion plans, and would also make a stock offering difficult or impossible. Thus, with CohnReznick balking at certifying WMI's inventory, CPI announced in October 2018 it would provisionally accept the inventory count made by WMI's auditor.

79.    Thereafter, CPI proceeded to report WMI's numbers on a "provisional" basis, all the while doubting that such numbers were realistic.

80.    Indeed, CPI was determined not to accept these numbers, and immediately after the deal closed in late 2018 conducted its own review from February 16-28, 2019, which revealed that WMI inventory was worth millions less than claimed. *See* WMI Litigation, Expert Report, Doc. No. 111, filed Sept. 27, 2019, p. 4. CFO Palazzolo did not produce his closing statement report on the true state of affairs until March 19, 2019. Even then, his calculations were not shared with the public.

81.    These facts create a reasonable inference that CPI and its Board "managed" the WMI situation such that no WMI inventory audit was completed prior to the October 2018 Offering, and the true inquiry into WMI's condition was held off until after the early 2019

Restatement was completed.

### D.    CPI PRETENDS TO ADOPT ASC 606

82.    According to Financial Accounting Standard's Board ("FASB"), ASC 606 provides a framework for businesses to recognize revenue more consistently to eliminate variations in the way businesses across industries handle accounting for similar transactions. FASB states that the core principle of ASC 606 is "that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those good or services."[7]

83.    A key goal of ASC 606 was to eliminate revenue recognition based on guesswork as to whether or not a binding contract regarding future work projects would ever come into existence. Thus, ASC requires a contract that is not just possible, but rather one that is presently enforceable "*as a matter of law*." ASC 606-10-05-4 defines a contract broadly as an "agreement between two or more parties that creates enforceable rights and obligations."

84.    Accordingly, CFO Azmon explained



85.    ASC 606 was known to have broad ramifications on a company's accounting and

---

[7] https://asc.fasb.org/imageRoot/32/79982032.pdf

finance departments – impacting IT systems, HR policies and more.  But CPI did not ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ This, of course, is because under

the Individual Defendants,  *CPI had "no procedures" for ensuring revenue was constrained to*

*funded contract value or for ensuring the period of performance or value of the accounting*

*contract were properly determined and in other areas, "no controls exist[ed]" at all.*  See Form

10-K, filed August 25, 2020, p. 32.  Instead, the Individual Defendants, ██████████████

██████████████████████████████████████████████████

████████████████████████████████████████

86.     CFO Azmon ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

87.     ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

26

████████████████████████████████

88.    Stated another way, ███████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████

89.    But this was not how the Board had been doing things, as it well knew. Despite the drastic new accounting rule, somehow nothing at all had changed as to revenue recognition at CPI. As stated in a press release announcing CPI's first quarter 2018 financial results on May 15, 2018:

> Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method. *Revenue recognition on all of the Company's contracts did not change materially as a result of the adoption of ASC 606.* (Emphasis added).

90.    Given the Board's knowledge of the characteristics of CPI's major contracts, this made no sense. In connection with issuance of its first quarter 2018 financial results and in subsequent statements, CPI touted strong revenue growth driven by its operations and stated that its internal control over financial reporting was effective. In fact, however, CPI's Board was failing the Company and its shareholders. Indeed, Azmon revealed that ████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████

27

91.    According to Azmon:



### E.    THE INDIVIDUAL DEFENDANTS CAUSE OR ALLOW CPI TO ISSUE FALSE AND MISLEADING STATEMENTS

92.    CPI's directors allowed the Company to issue false and misleading statements to the investment public that misstated the Company's current revenues and outlook and deceiving investors as to the effectiveness of CPI's internal controls over financial reporting.

93.    An August 8, 2018 press release announcing CPI's second quarter 2018 financial results, stated in relevant part:

> Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method. None of the Company's contracts' revenue recognition changed materially as a result of the adoption of ASC 606.
>
> **2Q 2018 vs. 2Q 2017**
> - Revenue was $20.3 million compared to $16.7 million;
> - Gross profit was $4.6 million compared to $3.7 million;
> - Gross margin was 22.6% compared to 22.0%;
> - Pre-tax income was $1.6 million compared to $1.2 million;
> - Net income was $1.3 million compared to $0.8 million;
>
>              * * *
>
> "We delivered another solid performance in the second quarter highlighted by higher revenue sequentially and year-over-year and the fifth consecutive quarter of EPS profitability that underscores our growing reputation as an efficient supply chain partner to the defense industry and continued focus on operational excellence," said Douglas McCrosson, president and CEO. "We are particularly pleased to deliver growth for the quarter and first half of the year that exceeded our plans in light of the uncertain defense spending environment entering 2018 that was

28

resolved with the recent passage of the 2018 Omnibus Spending Bill.

94.      A November 8, 2018 press release announcing CPI's third quarter 2018 financial

results stated in relevant part:

**3Q 2018 vs. 3Q 2017**
- Revenue was $19.9 million compared to $20.7 million;
- Gross profit was $4.8 million compared to $4.9 million;
- Gross margin was 24.1% compared to 23.7%
- Pre-tax income was $1.6 million compared to $2.5 million;
- Net income was $1.3 million compared to $1.7 million;
- Earnings per diluted share were $0.15 compared to $0.19 per diluted share;
- Cash flow from operations was $0.5 million compared to $0.9 million; and
- Total backlog at $442.2 million with multi-year defense contracts comprising 83%.

Douglas McCrosson, president and CEO of CPI Aero, stated, "We are pleased to report another strong quarter of execution, profitability and positive cash flow while progressing business development initiatives that yielded a 23% sequential increase in total backlog."

95.      CPI's quarterly reports on Form 10-Q filed May 15, 2018, August 9, 2018 and

November 13, 2018, respectively, touted the same revenue growth and earnings.

96.      Unbeknownst to investors, there was a purported ██████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ That such a major deviation from the true

state of affairs stemmed from ██████████████████ strains credulity, and the sophisticated CPI

Board could not have believed it.   In truth, the error was a direct result of the Individual

Defendants' mismanagement and breaches of fiduciary duty.

97.      On February 7, 2019, after the close of trading, CPI disclosed that the Audit

Committee of the Company's Board of Directors determined based on the recommendation of

management and in consultation with CohnReznick LLP, "that the Company's previously issued

financial statements as of and for the three and nine months ended September 30, 2018 included

in its Form 10-Q as filed with the Securities and Exchange Commission on November 13, 2018, should no longer be relied upon due to an error in the financial statements that was identified by management." Form 8-K, filed February 7, 2019.

98.        ████████████████        led to "(i) a reduction of revenue and income before provision for income taxes of $927,257, (ii) a reduction of net income of $742,257 and (iii) a reduction of basic and fully diluted earnings per share of $ 0.08, for each such period." Form 10Q-A, filed February 27, 2019, p. 9.

> In addition, the Company reported material weaknesses in its internal controls:
>
> In connection with the restatement noted above, ***management has determined that a material weakness existed in the Company's internal control over financial reporting as of September 30, 2018. As a result, the Company's chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018.*** A discussion of the Company's plan to remediate the material weakness will be contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2018, which the Company expects to file with Securities and Exchange Commission on or before its filing deadline.

99.    These numbers are very significant in relation to the original numbers reported. For the nine months ended September 30, 2018, net income was adjusted downward from $3.84 million to $3.10 million, a decline of 19% (and 60% for the third quarter of fiscal 2018 alone). This disparity was due to the false recognition of revenue in the amount of $927,000, which remarkably increased income by *$742,000. See* Form 10Q-A, filed February 27, 2019, p. 9.

100.    Conveniently, this "error" was discovered right after the completion of a secondary stock offering on October 16, 2018 through which CPI sold $16.1 million worth of stock at $6.25 per share.

101.    Although it was not required to do so, CPI offered a prediction in the Prospectus Supplement for that stock offering of a robust third quarter of 2018, a prediction that was almost

immediately shown to be false due to the accounting "error." On page S-8 of the Prospectus Supplement dated October 17, 2018, CPI stated: "We expect to announce the results for the quarter ended September 30, 2018 on or about November 8, 2018. ***We preliminarily expect to report revenue of approximately $19 million, with diluted earnings per share of approximately $0.13/share***." Form 10Q-A, filed February 27, 2019, p. 10 (emphasis added). This would have been perceived by new investors (or existing investors wishing to add to their positions) as an indication CPI was on an even keel. Earnings for the three months ended June 30, 2018 were 14 cents per share. *See* Form 10-Q, August 9, 2018, p.4. The 13 cents per share prediction was consistent with that.

102.    While such bullish numbers were indeed soon reported (indeed, an even higher 15 cents per share number was announced on November 8, 2018), *they were false.* The restatement just weeks later (right before the auditors came in) showed true earnings per share to have been *7 cents per share*, less than half the number reported. Predicting the true number—a mere 7 cents per share—would have been to forecast a serious financial reversal, which would have damaged or precluded the stock offering. Thus, the motive for a manipulation is clear.

103.    Instead of being reprimanded or dismissed for this "error," CFO Palazzolo was rewarded. As the 2019 Proxy Statement reported: "For the year ended December 31, 2018, Mr. Palazzolo received $53,697 in performance-based cash compensation. In addition, Mr. Palazzolo was awarded an aggregate of 13,002 shares of restricted stock (with a fair market value on the date of grant of $107,267) pursuant to the Company's 2016 long-term incentive plan." Proxy, filed April 30, 2019, p.19.

104.    These benefits were granted to Palazzolo even while the Audit Committee at its

March 6, 2019 meeting[8] was discussing ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

105.    Even after 2019 Restatement and a purported review of CPI's financial closing process, the Individual Defendants failed to reach a satisfactory resolution of their flawed approach to revenue recognition, continuing to utilize a compromised methodology that did not comport with the conservatism required in this area of accounting and was clearly inconsistent with ASC 606.  As stated in the February 27, Form 10-Q/A, p. 8 "[f]ollowing the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice."

106.    On March 13, 2019, CPI issued a press release announcing the Company's fourth quarter and full year 2018 financial results. Therein, the Company stated, in relevant part:

**Full Year 2018 vs. Full Year 2017**
- Revenue was $83.9 million compared to $81.3 million;
- Gross profit was $18.3 million compared to $18.6 million;

* * *

"2019 is off to a very strong start with new programs recently announced with long-time customers Sikorsky, Lockheed Martin, and Northrop Grumman and strong quote activity across the defense and commercial segments of our business. With initial production deliveries scheduled for 2019, execution on the Lockheed Martin and Northrop Grumman programs, in particular, are especially fundamental to our revenue growth this year," continued Mr. McCrosson. "In addition, WMI's

---

[8] The March 6, 2019 Audit Committee meeting was attended by ████████████ ████████████████████████████████████

bookings have been better than anticipated with approximately $3 million in new orders secured to date this year," Concluded Mr. McCrosson, "***Having laid the foundation for our future growth through organic as well as inorganic initiatives in 2018, we are focused on executing across our entire portfolio in 2019 while also pursuing an active M&A strategy to supplement our organic growth.*** With defense spending stable near-term and macro drivers that favor positive spending trends longer-term, momentum in new awards and a strengthened balance sheet, we have the elements in place for both top and bottom line growth 2019."

107.    On April 1, 2019, CPI filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018, affirming the previously reported financial results. The report also contained SOX certifications signed by Messrs. McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of CPI's internal control over financial reporting.

108.    Behind the scenes, the Audit Committee Chair ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

109.    On May 10, 2019, CPI issued a press release announcing its first quarter 2019 financial results. Therein, the Company stated, in relevant part:

**First Quarter 2019 vs. First Quarter 2018**
- Revenue of $25.6 million compared to $18.2 million
- Gross profit of $5.4 million compared to $4.0 million
- Gross margin was 21.2% compared to 22.3%
- Pre-tax income of $2.1 million compared to $1.6 million
- Net income of $1.7 million compared to $1.3 million
- Earnings per diluted share of $0.14 compared to $0.14 on a higher number of shares outstanding
- Total backlog at $452.9 million with multi-year defense contracts comprising 84%
- Cash flow from operations was $(2.3) million compared to $(2.6) million

"2019 is off to a very strong start with higher revenue, gross profit and net income year-over-year and excellent execution on key strategic priorities for the year. We completed the consolidation of Welding Metallurgy, Inc. ("WMI") into our facility on schedule and we have been hitting our customer's production milestones on the new programs that cumulatively underpin our growth expectations this year and

beyond," stated Douglas McCrosson, president and CEO of CPI Aero.

"*Revenue growth in the quarter was driven predominantly by the increase in production rate of our Next Generation Jammer Pod program for Raytheon and revenue from our WMI subsidiary.* We also had a strong booking quarter for both CPI Aero and WMI. Our consolidated shipping backlog increased by approximately 14% during the quarter and now is approximately $134 million, for a book-to-bill ratio of approximately 2.0 during the quarter."

110.    On May 10, 2019, CPI also filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019, affirming the previously reported financial results. The report contained SOX certifications signed by Messrs. McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of CPI's internal control over financial reporting.

111.    On June 19, 2019, long-time director Harvey Bazaar, quietly retired from his roles as a CPI director and Audit Committee Chair.

112.    On August 7, 2019, CPI to issue a press release announcing its second quarter 2019 financial results. The press release stated, in relevant part:

**Second Quarter 2019 vs. Second Quarter 2018**
- Revenue of $23.2 million compared to $20.3 million
- Gross profit of $5.0 million compared to $4.6 million
- Gross margin was 21.4% compared to 22.6%

\* \* \*

"*We delivered solid, year-on-year growth in revenue and net income in the second quarter that reflects continued operational execution and progression on our strategic priorities*," stated Douglas McCrosson, president and CEO of CPI Aero. "Similar to the first quarter, bookings at CPI Aero and WMI were strong, and product sales backlog now stands at $153.2 million, up 14 % from the end of the first quarter. We also continued to execute on our Next Generation Jammer pod program, as well as our three new key programs that are central to our growth expectations in 2019 and support a multi-year growth trajectory.

113.    On August 8, 2019, CPI filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019, affirming the previously reported financial results. The report also

contained SOX certifications signed by Messrs. McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of CPI's internal control over financial reporting.

114.    On November 6, 2019, CPI issued a press release announcing its third quarter 2019 financial results. The press release stated, in relevant part:

**Third Quarter 2019 vs. Third Quarter 2018**
- Revenue of $25.7 million compared to $19.0 million, an increase of 35%;
- Gross profit of $5.0 million compared to $3.9 million, an increase of 28%;
- Gross margin was 19.3% compared to 20.4%, a decrease of 110 basis points;

\* \* \*

"We delivered an exceptional quarter of growth and performed well operationally while advancing our strategic priorities for 2019. ***Revenue growth in the quarter was driven principally by our WMI subsidiary and from our Northrop Grumman E-2D Advanced Hawkeye and Raytheon Next Generation Jammer - Mid Band programs.*** We continued to win new contracts at a strong pace with the addition of several substantial awards and incremental new contracts for WMI and total backlog at September 30 is the highest in our history at $534 million," stated Douglas McCrosson, president and CEO of CPI Aero. "New contract momentum has continued into the fourth quarter, including an award from Raytheon to produce prototypes of a pod. We were also pleased to be recognized for our capabilities and expertise with the receipt last month of an Aviation Week Program Excellence Award for our work on Next Generation Jammer- Mid Band."

115.    On November 8, 2019, CPI filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019, affirming the previously reported financial results. The report also contained SOX certifications signed by Messrs. McCrosson and Palazzolo, attesting to the accuracy of the financial reports and the effectiveness of CPI's internal control over financial reporting.

116.    None of the above statements disclosed: (i) that the Company had improperly recognized revenue from contracts with customers; (ii) that, as a result, revenue was overstated; and (iii) that there was a material weakness in CPI's internal control over financial reporting.

117.    On November 11, 2019, without explanation, CFO Palazzolo left the Company. Although the SEC Form 8-K filed by CPI on November 13, 2019, required CPI to state whether Palazzolo had resigned or been fired, it merely stated that he "left the company," in violation of this important disclosure rule. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
███████████

████████████████████

118.    ███████████████    Form 8-K also stated: "Mr. Palazzolo will receive separation benefits as set forth in the Severance and Change in Control Agreement entered into on July 7, 2016, which is attached as Exhibit 10.2 to the Company's Current Report on Form 8-K filed on July 7, 2016." These provisions would results in severance payments and benefits to Mr. Palazzolo of approximately $300,000.

119.    Separately, McCrosson, on behalf of CPI, ██████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████



120. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

**F.** ▮▮▮▮ ▮ ▮▮▮▮ ▮ **THE INDIVIDUAL DEFENDANTS' SCHEME UNRAVELS**

121.    In December 2019, just a few weeks after stepping into the role of CFO, and in connection with the Company's preparation of its year-end financial statements, Azmon ▮▮▮ ▮▮▮▮▮▮▮▮ That Azmon ▮▮▮▮▮▮ is no surprise.  It would have been obvious to Azmon, an experienced CFO well-versed in ASC 606, that ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮

122.    A telephonic meeting of the Audit Committee was held on February 4, 2020 – ▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮

███████████████████

123.    Audit Committee Chair ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

124.    Defendant Cooper summarized ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

125.    Cooper ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

126.    ██████████ the Audit Committee and Board Chair Stinson ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

127.    ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

128.    On February 10, 2020, the Audit Committee held an in-person meeting at the offices of Graubard Miller, CPI's general counsel.[9] Cooper noted that ████████████████

---

[9] The February 10, 2020 meeting was attended by ██████████████████
████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

129. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ [10]

130.    Cooper stated that ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

_____

████████████████████

[10] Azmon's February 10, 2020 presentation to the Audit Committee ████████████
████████

and Mr. Azmon . . .").

131. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ [11] Obviously, this is illogical, as ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

132. CR further ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ The Board knew that

this was how things were done both pre- and post- ASC 606, and ████████████

133. Clearly this was the approach advocated by McCrosson who proceeded to respond

to ███████████████████████████████████████████████

████████████████████████████████████████████████████

---

[11] CR's February 10, 2020 presentation to the Audit Committee ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ Defendant Bond also responded ████████████████

████████████████████████████████████████ ASC 606 was designed to put an

end to this type of program accounting. As early as 2016, aerospace companies were warned that:

> Under the [ASC 606] standard, the performance obligations (i.e, the unit of account under current literature) may not be consistent with the company's current accounting policies or billing practices. *Distinct performance obligations within contracts must be treated as separate units of accounting for revenue recognition purposes.*[12] [Emphasis added].

134.    A discussion regarding the Company's ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██ ███ █ ███ ███ █ ████ ███ █ ███ ███ ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

135.    Just days before during the February 4 Audit Committee meeting, the committee

members ██████████████████████████████████, but CR, ████████████████

███████████████████████████████████████████████████████

---

[12] Deloitte, *New Revenue Standard Issued: Potential Challenges in the Aerospace and Defense Industry* (2016), available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/risk/us-aers-new-revenue-standard-issued-aerospace-and-defence.pdf



136. ███████████████████████████████████████████

137. Two days later, at a meeting of the Board held on February 12, 2020, McCrosson advised the directors that ████████████████████████████████████

███████████████

138.    Two days later, on February 14, 2020, the Company announced the 2020 Restatement – CPI's *second* restatement in only two years – revealing that its financial statements for numerous periods should no longer be relied upon due to errors related to recognition of revenue from contracts with customers under ASC Topic 606. Specifically, CPI disclosed in a press release, in relevant part:

> [CPI] today announced that the Audit Committee of the Board of Directors of CPI Aero determined, based on the recommendation of management and in consultation with CPI Aero's independent registered public accounting firm, that the Company's financial statements included in its annual report on Form 10-K for the year ended December 31, 2018, quarterly reports on Forms 10-Q for the quarters ended March 31, 2018, June 30, 2018, and September 30, 2018, and quarterly reports on Forms 10- Q for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019 ***should no longer be relied upon due to an error in those financial statements relating to the Company's recognition of revenue from contracts with customers under ASC Topic 606. Similarly, the independent auditor's reports on the effectiveness of internal control over financial reporting for the year ended December 31, 2018, management's reports on the effectiveness of internal control over financial reporting, press releases, and investor communications describing the Company's financial statements for such periods should no longer be relied upon.*** The Company's cash flows from operations for the affected periods are not expected to be impacted.
>
> The error was uncovered as part of the preparation of the Company's 2019 annual financial statements. After reconsideration of the terms of the Company's contracts with customers, ***Management's preliminary conclusion is that certain revenues and net income were recognized prematurely or inaccurately due to an incorrect application of generally accepted accounting principles. Therefore, previously reported revenue and net income are believed to have been overstated.*** The error is also expected to have an impact on the Company's balance sheets for the affected periods. Specifically, retained earnings and contract assets are believed to be overstated.
>
> In addition, the Company reported:
>
> ***Management has determined that a material weakness existed in the Company's internal control over financial reporting as of the end of each of the affected periods.*** The Company has reviewed its financial closing process and believes it has identified the corrective action necessary to remediate the cause of the error. The Company plans to include a discussion of the Company's plan to remediate the

material weakness in its annual report on Form 10-K for the year ended December 31, 2019.

139.    On this news, the Company's stock price fell $1.80 per share, or approximately 27%, to close at $4.87 per share on February 14, 2020. The stock presently trades at about $2.50 a share, a level not seen since 2002.

G.    **THE 2020 RESTATEMENT**

140.    On August 25, 2020, the Company filed a Form 10-K for the fiscal year ended December 31, 2019, containing the 2020 Restatement. The errors primarily related to the timing of recognition of revenue from contracts which resulted in the recognition of $100.9 million of misstated contract assets, contract liabilities and loss reserves. The Company restated its pre-tax income by more than $14.2 million – more than two times less than the originally reported $6.6 million – resulting in a loss of $7.5 million:

*Restatement*

The following is a discussion of the restatement adjustments that were made to the Company's previously issued consolidated financial statements:

(a) Revenue recognition

The Company recognizes revenues and profits for contracts with customers using the cost-to-cost percentage of completion method of accounting. Historically, for long-term programs, the Company applied the cost-to-cost percentage of completion method at the program level, that is, for the entire duration of expected production activity on a particular program. The Company estimated its revenue recognition utilizing the life of the program to both measure progress and estimate profit margin. Under this approach, the Company estimated the total expected customer purchases over the life of the program, which included unexercised and non-binding customer purchase options, which resulted in the recognition of $100.9 million of misstated contract assets, contract liabilities and loss reserves.

The Company has now concluded that its life of the program accounting was not an appropriate application of ASC Topic 606. Under ASC Topic 606, the performance obligation is the appropriate unit of accounting. The Company identifies performance obligations to customers once a contract is established in accordance with ASC Topic 606. For the Company, the contract under ASC Topic

45

606 is typically established upon execution of a purchase order either in accordance with a long-term customer agreement or on a standalone basis. The transaction price is also determined at the contract level and excludes amounts related to unexercised customer options. Similarly, the Company's cost-to-cost input method to measure progress must consider only the costs incurred relative to the total expected costs of satisfying the performance obligations identified in the contract, exclusive of unexercised customer options.

To correct these errors, the related revenue was reversed in the period in which the accounting errors took place and recognized in subsequent periods as control of the goods or services in the contract passed to the customer over time based on a cost-to-cost input method measure of progress. Additionally, certain adjustments to contract assets and contract liabilities were made to the consolidated balance sheet at the end of the period in which the accounting errors occurred.

<u>(b) Other</u>

The Company corrected other immaterial misstatements relating to previously unrecorded audit adjustments.

<u>(c) Income taxes</u>
 The Company has recorded tax adjustments related to the impact of the restatement.

*Impact on Consolidated Statements of Operations*

The effect of the Restatement described above on the accompanying consolidated statements of operations for the fiscal year ended December 31, 2018 is as follows:

| | **For the Year Ended December 31, 2018** | | | | |
|---|---|---|---|---|---|
| | **As Previously Reported** | **Revenue Recognition** | **Other** | **Income Taxes** | **As Restated** |
| Revenue | $83,929,270 | $(13,563,254) | $— | $— | $70,366,016 |
| Cost of sales | 65,765,007 | 671,122 | (280,143) | — | 66,155,986 |
| Gross profit | 18,164,263 | (14,234,376) | 280,143 | — | 4,210,030 |
| Selling, general and administrative expenses | 9,528,883 | — | 251,144 | — | 9,780,027 |
| Income (loss) from operations | 8,635,380 | (14,234,376) | 28,999 | — | (5,569,997) |
| Other expense: | | | | | |
|   Other income | 28,709 | — | — | — | 28,709 |
|   Interest expense | (1,989,417) | — | — | — | (1,989,417) |

| | | | | | |
|---|---|---|---|---|---|
| Total other expense, net | (1,960,708) | — | — | — | (1,960,708) |
| Income (loss) before provision for income taxes | 6,674,672 | (14,234,376) | 28,999 | — | (7,530,705) |
| Provision for income taxes | 4,463,109 | — | — | (4,447,061) | 16,048 |
| Net income (loss) | 2,211,563 | (14,234,376) | 28,999 | 4,447,061 | (7,546,753) |
| Other comprehensive income net of tax – change | | | | | |
| Change in unrealized loss-interest rate swap | 14,800 | | | | 14,800 |
| Comprehensive income (loss) | $2,226,363 | $(14,234,376) | $28,999 | $4,447,061 | $(7,531,953) |
| | | | | | |
| Income (loss) per common share – basic | $0.23 | | | | $(0.80) |
| Income (loss) per common share – diluted | $0.23 | | | | $(0.80) |
| | | | | | |
| Shares used in computing earnings per common share: | | | | | |
| Basic | 9,480,948 | | | | 9,480,948 |
| Diluted | 9,489,630 | | | | 9,480,948 |

*Impact on Consolidated Statement of Comprehensive Income (Loss)*

The only change to the consolidated statement of comprehensive income (loss) for the fiscal year ended December 31, 2018 as a result of the Restatement is due to the change in net income (loss).

*Impact on Consolidated Balance Sheet*

The effect of the Restatement described above on the accompanying consolidated balance sheet as of December 31, 2018 is as follows:

| | **As of December 31, 2018** | | | | |
|---|---|---|---|---|---|
| | As Previously Reported | Revenue Recognition | Other | Income Taxes | As Restated |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash | $4,128,142 | $— | $— | $— | $4,128,142 |
| Restricted cash | 2,000,000 | — | — | — | 2,000,000 |
| Accounts receivable, net | 8,623,329 | — | 99,242 | — | 8,722,571 |
| Contract assets | 113,333,491 | (95,744,625) | — | — | 17,588,866 |
| Inventory | 9,711,997 | — | (350,386) | — | 9,361,611 |

| | | | | | |
|---|---|---|---|---|---|
| Refundable income taxes | 435,000 | — | — | (97 ) | 434,903 |
| Prepaid expenses and other current assets | 1,972,630 | — | — | — | 1,972,630 |
| **Total Current Assets** | **140,204,589** | **(95,744,625 )** | **(251,144)** | **(97 )** | **44,208,723** |
| | | | | | |
| Property and equipment, net | 2,545,192 | — | — | — | 2,545,192 |
| Refundable income taxes | 435,000 | — | — | (97 ) | 434,903 |
| Deferred income taxes | 279,318 | — | — | (279,318 ) | — |
| Other assets | 249,575 | — | — | — | 249,575 |
| **Total Assets** | **$143,713,674** | **$(95,744,625 )** | **$(251,144 )** | **$(279,512 )** | **$47,438,393** |
| | | | | | |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | | |
| Current Liabilities: | | | | | |
| Accounts payable | $9,902,481 | $— | $— | $— | $9,902,481 |
| Accrued expenses | 1,558,160 | — | — | — | 1,558,160 |
| Contract liabilities | 3,588,500 | 1,664,079 | — | — | 5,252,579 |
| Loss reserve | 216,606 | 3,446,952 | — | — | 3,663,558 |
| Current portion of long-term debt | 2,434,981 | — | — | — | 2,434,981 |
| Income taxes payable | 115,000 | — | — | (1,008 ) | 113,992 |
| **Total Current Liabilities** | **17,815,728** | **5,111,031** | **—** | **(1,008 )** | **22,925,751** |
| | | | | | |
| Line of credit | 24,038,685 | — | | | 24,038,685 |
| Long-term debt, net of current portion | 3,876,238 | — | — | — | 3,876,238 |
| Deferred income taxes | 4,028,553 | — | — | (4,028,553 ) | — |
| Other liabilities | 531,124 | — | — | — | 531,124 |
| **Total Liabilities** | **50,290,328** | **5,111,031** | **—** | **(4,029,561)** | **51,371,798** |
| | | | | | |
| **Shareholders' Equity (Deficit):** | | | | | |
| Common stock | 11,718 | — | — | — | 11,718 |
| Additional paid-in capital | 70,651,413 | — | — | — | 70,651,413 |
| Retained earnings (accumulated deficit) | 22,760,215 | (100,855,656) | (251,144) | 3,750,049 | (74,596,536) |
| **Total Shareholders' Equity (Deficit)** | **93,423,346** | **(100,855,656)** | **(251,144)** | **3,750,049** | **(3,933,405 )** |
| **Total Liabilities and Shareholders'** | **$143,713,674** | **$(95,744,625 )** | **$(251,144 )** | **$(279,512 )** | **$47,438,393** |

| Equity (Deficit) | | | | | |
|---|---|---|---|---|---|

*Cumulative Effect of Prior Period Adjustments*

The following table presents the impact of the Restatement on the Company's shareholders' equity (deficit) as of January 1, 2018:

| | Common Stock | Additional Paid-in Capital | Retained Earnings (accumulated deficit) | Accumulated Other Comprehensive Loss | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| Balance, January 1, 2018 (As previously reported) | $8,864 | $53,770,617 | $20,548,652 | $(14,800) | $74,313,333 |
| Adjustments: | | | | | |
| Revenue recognition | — | — | (86,621,280) | — | (86,621,280) |
| Other | — | — | (280,143) | — | (280,143) |
| Income taxes | — | — | (697,012) | — | (697,012) |
| Cumulative restatement adjustments | — | — | (87,598,435) | — | (87,598,435) |
| Balance, January 1, 2018 (As Restated) | $8,864 | $53,770,617 | $(67,049,783) | $(14,800) | $(13,285,102) |

*Impact on Consolidated Statement of Cash Flows*

The effect of the Restatement described above on the accompanying consolidated statement of cash flows for the fiscal year ended December 31, 2018 is as follows:

| | For the Year Ended December 31, 2018 | | |
|---|---|---|---|
| | As Previously Reported | Restatement Adjustments | As Restated |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $2,211,563 | $(9,758,316) | $(7,546,753) |
| **Adjustments to reconcile net income (loss) to net cash used in operating activities:** | | | |
| Depreciation and amortization | 710,197 | — | 710,197 |
| Amortization of debt issuance cost | 95,942 | (436) | 95,506 |
| Deferred rent | (70,764) | — | (70,764) |

| | | | | |
|---|---|---|---|---|
| Stock-based compensation expense | 671,620 | — | | 671,620 |
| Common stock issues as employee compensation | 45,913 | — | | 45,913 |
| Deferred income taxes | 5,337,053 | (5,337,053 | ) | — |
| Adjustment for maturity of interest rate swap | 20,600 | (5,800 | ) | 14,800 |
| Bad debt expense | 125,000 | (99,242 | ) | 25,758 |
| **Changes in operating assets and liabilities, net of effects of acquisition:** | | | | |
| Increase in accounts receivable | (1,796,225 ) | (50,283 | ) | (1,846,508 ) |
| (Increase) decrease in contract assets | (2,174,941 ) | 12,629,627 | | 10,454,686 |
| (Increase) decrease in inventory | (57,272 ) | 350,038 | | 292,766 |
| (Increase) decrease in prepaid expenses and other current assets | 5,702 | (27,957 | ) | (22,255 ) |
| Increase in refundable income taxes | (870,000 ) | 870,000 | | — |
| Decrease in accounts payable and accrued expenses | (7,696,024 ) | (230,771 | ) | (7,926,795 ) |
| Increase in contract liabilities | 866,968 | 1,563,954 | | 2,430,922 |
| Increase (decrease) in loss reserve | 44,933 | (59,329 | ) | (14,396 ) |
| Decrease in other liabilities | (10,976 ) | 5,801 | | (5,175 ) |
| Increase in income taxes payable | 5,673 | (1,008 | ) | 4,665 |
| **Net cash used in operating activities** | (2,535,038 ) | (150,775 | ) | (2,685,813 ) |
| **Cash flows from investing activities:** | | | | |
| Purchase of property and equipment | (559,037 ) | — | | (559,037 ) |
| Purchase of WMI | (6,050,906 ) | 98,906 | | (5,952,000 ) |
| **Net cash used in investing activities** | (6,609,943 ) | 98,906 | | (6,511,037 ) |
| **Cash flows from financing activities:** | | | | |
| Net proceeds from sale of common stock | 16,166,117 | — | | 16,166,117 |
| Payment of line of credit | (6,500,000 ) | — | | (6,500,000 ) |
| Proceeds from line of credit | 7,700,000 | — | | 7,700,000 |
| Payment of long-term debt | (3,314,789 ) | — | | (3,314,789 ) |
| Debt issuance costs | (209,082 ) | 51,869 | | (157,213 ) |
| **Net cash provided by financing activities** | 13,842,246 | 51,869 | | 13,894,115 |
| Net increase in cash and restricted cash | 4,697,265 | — | | 4,697,265 |
| Cash and restricted cash at beginning of year | 1,430,877 | — | | 1,430,877 |
| Cash and restricted cash at end of year | $6,128,142 | $— | | $6,128,142 |
| **Supplemental schedule of noncash investing and financing activities:** | | | | |
| Equipment acquired under capital leases | $649,410 | $— | | $649,410 |
| **Supplemental schedule of cash flow information:** | | | | |
| Cash paid during the year for interest | $2,134,574 | $— | | $2,134,574 |
| Cash paid for income taxes | $10,947 | $— | | $10,947 |

141.    The 2020 Restatement also acknowledged, one again, material weaknesses in internal control over financial reporting, including a ***complete and utter lack of procedures*** for

ensuring revenue was constrained to funded contract values, *the absence of any controls* in the accounting for significant non-routine complex transaction and *failure to hire and retain personnel with an appropriate level of knowledge, experience, and training* in financial reporting:

> In connection with management's evaluation of the Company's internal control over financial reporting described above, management has identified the deficiencies described below that constituted material weaknesses in our internal control over financial reporting as of December 31, 2019 and December 31, 2018. One of these deficiencies led to material errors in our previously issued consolidated financial statements, which in turn led to the restatement of those previously issued consolidated financial statements, as described in Note 18 to our consolidated financial statements included in this Annual Report on Form 10-K.

> *Control Environment, Risk Assessment, Control Activities and Monitoring*
> We did not maintain effective internal control over financial reporting related to the following areas: control environment, risk assessment, control activities and monitoring:

> - Management did not effectively execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.
> - Management lacked sufficient technical proficiency and training to provide adequate oversight of accounting and financial reporting activities in implementing certain accounting practices and calculations to conform to the Company's policies and U.S. GAAP.
> - There were insufficiently documented Company accounting policies and insufficiently detailed Company procedures to put policies into effective action.

> *Revenue Recognition Accounting*
> We identified material weaknesses from revenue recognition accounting controls that resulted in material errors, as we did not appropriately design, or effectively operate, internal control over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs. The following were contributing factors to the material weaknesses in revenue recognition accounting:

> - Our internal control lacked procedures for ensuring the period of performance or value of the accounting contract were properly determined.
> - Our internal control lacked procedures for ensuring revenue was constrained to funded contract values.

> *Accounting for Significant Non-Routine Complex Transactions*

We identified a material weakness in our accounting for significant, non-routine, complex transactions. No controls exist and we failed to hire qualified external resources with the appropriate accounting expertise. While no material errors were identified, the lack of controls caused a reasonable possibility that a material error could have occurred.

*Information Technology General Controls (ITGC)*

There were ineffective ITGCs, specifically in testing and documenting the areas of access to programs and data, program change-management and computer operations. As a result, business process automated and manual controls that were dependent on the affected ITGCs may be ineffective because they could have been adversely impacted. These control deficiencies were a result of: 1) IT control processes that lacked sufficient testing and documentation; 2) risk-assessment processes inadequate to identify and assess changes in IT environments and 3) user access reviews that could impact internal control over financial reporting. While no material errors were identified, the insufficiency of our testing caused a reasonable possibility that a material error could have occurred.

## VII.    DAMAGES TO CPI

142.    Revelations about the Company's continued inability (or refusal) to maintain adequate internal controls over financial reporting and unusual executive departures spawned a spate of shareholder litigation, including a federal securities class action for violations of the federal securities laws.

143.    Moreover, CPI recently revealed that the SEC is investigating the 2019 and 2020 Restatements, the October 16, 2018 equity offering and the sudden CFO departures:

On May 22, 2020, the Company received a letter (the "SEC Letter") from the SEC Division of Enforcement (the "Division") indicating that the Division staff is conducting an investigation involving the Company. The SEC Letter states that the investigation is a non-public fact finding inquiry where the Division staff is trying to determine whether there have been any violations of federal securities laws. As part of this investigation, the Division issued a subpoena to the Company seeking documents and information relating, among other things, to previously-disclosed errors in and restatements of, the Company's financial statements, the Company's October 16, 2018 equity offering and the recent separation of the Company's former Chief Financial Officers. The SEC Letter states that the investigation and the subpoena do not mean that the Division staff has concluded that the Company or anyone else have violated the federal securities laws and that the investigation does not mean that the Division staff has a negative opinion of any person, entity or security. We intend to fully cooperate with the Division staff. However, we

cannot predict the length, scope, or results of the investigation or the impact, if any, of the investigation on our results of operations.

144. As a result of the Individual Defendants' breaches of fiduciary duty to CPI, the Company has suffered, and continues to suffer, extensive damage.

145. CPI has expended and will continue to expend significant sums of money that it otherwise would not have spent. Such expenditures include, but are not limited to: (a) accounting and legal fees; (b) a stock price diminution; (c) costs incurred in investigating and defending CPI in the securities class action lawsuits, plus potentially millions of dollars in settlements or to satisfy an adverse judgment; and (d) costs incurred from the compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on CPI's artificially inflated stock price and the misapprehension that the Individual Defendants were acting in compliance with their fiduciary duties.

146. As a result of the Individual Defendants' misconduct, CPI's corporate image and goodwill have also been irreparably damaged, and its cost of credit has no doubt increased.

## VIII. DEMAND IS FUTILE

147. Plaintiff incorporates by reference and realleges each and every allegations stated above as if fully set forth herein. Presently, the Board consists of the following six (7) individuals: defendants Stinson, Rosenfeld, McCrosson, Bond, Paulick and non-defendants Faber and Caswell. Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged in this Complaint and, therefore, such demand is excused.

148. As specified herein, demand is excused because this Complaint alleges with particularity that the members of the current Board lack disinterest because they breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision and face a substantial likelihood of liability. Indeed, the current members of the Board knowingly and

consciously failed to ensure that the Company had the internal controls, policies and procedures in place to prevent the wrongdoing alleged herein and caused or allowed CPI to issue false and misleading statements misstating the Company's financial condition, its operations, prospects, internal controls over financial reporting and compliance practices.

149.    The conduct described herein could not have been the product of legitimate business judgment as it was based on intentional, reckless and disloyal misconduct. Thus, none of the current directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As each of the current directors faces a substantial likelihood of liability, lacks self-interest in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company, demand is excused as futile.

150.    Read together with the facts summarized above and alleged with particularity herein, pre-suit demand is also as excused as futile for the following reasons:

- Defendant McCrosson lacks independence because his principal professional occupation is as CPI's President and Chief Executive Officer from which he derives significant compensation.

- Defendant Rosenfeld is a large shareholder of the Company, owning 760,415 shares or 6.4% of CPI's common stock. His significant pecuniary stake precludes him from disinterestedly considering a demand to bring this action on behalf of CPI. An inference that Rosenfeld knew during the relevant period that CPI's finances were fabricated arises from the fact that his fund has held the same number of CPI shares since at least 2013.

- Defendants Stinson, Rosenfeld, Cooper, Faber, Bond and Paulick each exhibited a complete and utter lack of independence when confronted with their own conscious failure to adjust CPI's accounting practices, ██████████████████████████████████████████ This demonstrated lack of independence sterilizes their ability to make a reasoned and impartial decision in response to a demand, rendering demand futile.

- The majority of the Directors actively or constructively, and in bad faith, disloyally misrepresented numerous facts to the shareholders concerning accounting issues, credit issues, ██████████, inventory values, and the adequacy of internal controls. Each faces a substantial likelihood of liability.

- Each of the current directors has revealed his or her interest and lack of independence by endeavoring to conceal their wrongdoing. These directors knowingly failed to report in filings with the SEC that ████████████████ ████████████████████ and concealed or misrepresented many other "unpleasant" facts, as detailed above.

- ████████████████████████████████████ ████████████████████████████████████ ████████████████ Such directors can never be viewed as sufficiently objective to consider a demand to bring this action.

- At least half of the current directors (Rosenfeld, Paulick and Faber) ████ ████████████████████████████████ going back to their service under CEO Fred. These acts cast doubt on their good faith and independence as well.

## IX.    PLAINTIFF'S CLAIMS

### COUNT ONE
#### (BREACH OF FIDUCIARY DUTY AGAINST ALL INDIVIDUAL DEFENDANTS)

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

153.    Under the current circumstances, the Individual Defendants also had a duty to: (a) act in the interests of the Company and all of its equity owners; and (b) act in accordance with the fundamental duties of loyalty, care and good faith.

154.    Because of their respective positions with the Company, the Individual Defendants

are also required to: (a) act independently to ensure that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder; and (b) ensure that if there are conflicts of interest between the Individual Defendants' interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Company and its public shareholders.

155.     In turning a blind eye to the falsity of CPI's public disclosures and by causing or allowing the misdeeds described herein, the Individual Defendants have not taken any steps to protect the interests of the Company and, in fact, have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

156.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in improper practices. The Individual Defendants had actual knowledge of the misstatements and omissions of material fact set forth in this Complaint, or acted with reckless disregard for the truth. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CPI's securities. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CPI has sustained significant damages.

158.     Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on CPI's behalf.

159.     Plaintiff and the Company have no adequate remedy at law.

## COUNT TWO
### (UNJUST ENRICHMENT AGAINST ALL INDIVIDUAL DEFENDANTS)

160.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

161.    The Individual Defendants received bonuses, stock options, stock or similar compensation from CPI that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of the Individual Defendants' bad faith conduct, violation of the Company's governance documents, committee charters and self-dealing.

162.    Plaintiff as a shareholder and representative of CPI, seeks restitution from the Individual Defendants and seeks and order of this Court disgorging all profits, benefits and other compensation – including any salary, options, performance-based compensation, and stock – obtained by Individual Defendants due to their wrongful conduct alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Authorizing the maintenance of this action as a derivative action, with Plaintiff as the derivative Lead Plaintiff;

B.    Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

C.    Awarding compensatory damages against defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

D.    Directing CPI and its Board to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect CPI and its shareholders from a repeat of the damaging events that occurred during the relevant time period, including, but not limited to,

- implementing a way to ensure compliance with relevant COSO guidelines;

- rotating outside auditing firms;

- establishing a Contracts Review Committee;

- creating guidelines as to when to seek outside legal or accounting assistance when complex issues arise;

- adding new directors with a background in aerospace accounting; reviewing the performance, skills and credibility of the CEO;

- benchmarking CPI's revenue recognition practices against those of similar firms;

- creating procedures for the Audit Committee to review and understand new accounting pronouncements;

- considering putting the Company up for sale via a strategic review assisted by competent financial advisers;

- seeking advice as to how to strengthen the balance sheet and capital structure;

- establishing a Disclosure Committee consisting of key executives;

- reviewing and strengthening whistleblower procedures;

- declassifying the Board;

- rejecting the plurality vote standard at Board elections;

- putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation;

- and taking such other action as may be necessary to adopt best corporate governance practices.

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

F.    Granting such other or further relief as may be just and proper under the circumstances.

Dated: November 10, 2020                Respectfully submitted,

**LAW OFFICES OF BETH A. KELLER, P.C.**

*/s/ Beth A. Keller*
Beth A. Keller
118 North Bedford Road, Suite 100
Mount Kisco, New York 10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
Email: bkeller@keller-lawfirm.com

**PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz
208 East 51st Street, Suite 380
New York, NY 10022
Telephone: (212) 685-0969
Email: lpaskowitz@pasklaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
350 Fifth Avenue, Ste. 4405
New York, NY 10118
Telephone: (646) 300-8921
Facsimile: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

***Attorneys for Plaintiff***

## <u>VERIFICATION</u>

I, Paul Berger, do hereby state under penalty of perjury this <u>4th</u> day of November, 2020 that I am the Plaintiff in the foregoing Verified Shareholder Derivative Complaint, and that I believe its allegations to be true, to the best of my information, knowledge and belief.


_Paul Berger_
Paul Berger